IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LINDA HART,                                          CV 07-397-MA

        Plaintiff,                                 OPINION AND ORDER

v.

MICHAEL ASTRUE,
Commissioner of Social
Security,

        Defendant.

TIM WILBORN
Wilborn Law Office, P.C.
19093 S. Beavercreek Road, PMB # 314
Oregon City, OR 97045
(503) 632-1120

        Attorneys for Plaintiff

KARIN J. IMMERGUT
United States Attorney
BRITANNIA I. HOBBS
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR  97204-2902
(503) 727-1158


1 - OPINION AND ORDER

DAVID J. BURNETT
Special Assistant United States Attorney
701 Fifth Avenue, Suite 2900 MS/901
Seattle, WA  98104-7075
(206) 615-2522

      Attorneys for Defendant

MARSH, Judge.

     Plaintiff Linda Hart seeks judicial review of the final
decision of the Commissioner denying her November 18, 2002,
application for supplemental security income benefits and
December 16, 2002, application for disability insurance benefits
under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83f
and §§ 401-33.

     Plaintiff claims she has been disabled since September 1,
2002, because of bipolar disorder, panic attacks with
agoraphobia, and migraine headaches.  Her claim was denied
initially and on reconsideration.  The Administrative Law Judge
(ALJ) held a hearing on June 17, 2005, and on October 4, 2007,
issued a decision that plaintiff was not disabled.  Plaintiff
timely appealed the decision to the Appeals Council.  On January
12, 2007, the Appeals Council denied plaintiff's request for
review.  The ALJ's decision, therefore, became the final decision
of the Commissioner for purposes of review.

     Plaintiff seeks an order from this court either reversing
the Commissioner's decision and remanding the case for an award

of benefits or remanding the case for further proceedings with instructions.

For the following reasons, the court **AFFIRMS** the final decision of the Commissioner.

## THE ALJ'S FINDINGS

The Commissioner has developed a five-step sequential inquiry to determine whether a claimant is disabled. <u>Bowen v. Yuckert</u>, 482 U.S.137, 140 (1987). <u>See also</u> 20 C.F.R. § 404.1520. Plaintiff bears the burden of proof at Steps One through Four. <u>See</u> <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098 (9th Cir. 1999). Each step is potentially dispositive.

At Step One, the ALJ found plaintiff had not engaged in substantial gainful activity since the onset of her alleged disability.

At Step Two, the ALJ found plaintiff has bipolar disorder and anxiety disorder that are severe impairments under 20 C.F.R. §404.1520(c)(an impairment or combination of impairments is severe if it significantly limits an individual's physical or mental ability to do basic work activities).

At Step Three, the ALJ found these impairments do not meet or equal a listed impairment.

The ALJ found plaintiff has the residual functional capacity to perform work that involves simple and routine tasks with only occasional public contact. She has no exertional limitations.

3 – OPINION AND ORDER

At Step Four, the ALJ found plaintiff is able to perform her past relevant work as a packer and small products assembler.

Consistent with the above findings, the ALJ found plaintiff was not under a disability and denied her claim for benefits.

### ISSUES ON REVIEW

Plaintiff contends the Commissioner's final decision should be reversed because the ALJ erred (1) in rejecting plaintiff's testimony based on lack of credibility, (2) in rejecting lay witness testimony, (3) in rejecting the medical opinions of plaintiff's physicians, (4) in finding plaintiff's migraine headaches were not severe, and (5) in providing an inadequate hypothetical to the vocational expert (VE) as a consequence of the above  errors.

### LEGAL STANDARDS

**Burden of Proof**.

The initial burden of proof rests on the claimant to establish disability.  Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996).  To meet this burden, the claimant must demonstrate the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C § 423(d)(1)(A).

The district court must affirm the Commissioner's decision

4 - OPINION AND ORDER

if it is based on proper legal standards and the findings are
supported by substantial evidence in the record as a whole.
42 U.S.C. § 405(g).  "Substantial evidence means more than a mere
scintilla but less than a preponderance; it is such relevant
evidence as a reasonable mind might accept as adequate to support
a conclusion."  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir.
1995).

    The court must weigh all of the evidence whether it supports
or detracts from the Commissioner's decision.  Martinez v.
Heckler, 807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's
decision must be upheld, however, even if the "evidence is
susceptible to more than one rational interpretation."  Andrews,
53 F.3d at 1039-40.

    The Commissioner bears the burden of developing the record.
DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).  The duty
to further develop the record, however is triggered only when
there is ambiguous evidence or when the record is inadequate to
allow for proper evaluation of the evidence.  Mayes v. Massanari,
276 F.3d 453, 459-60 (9th Cir. 2001).

    The decision whether to remand for further proceedings or
for immediate payment of benefits is within the discretion of the
court.  Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir.), cert.
denied, 121 S. Ct. 628 (2000).  "If additional proceedings can
remedy defects in the original administrative proceeding, a

social security case should be remanded." Lewin v. Schweiker,
654 F.2d 631, 635 (9th Cir. 1981).


**RELEVANT RECORD**

1. **Plaintiff's Testimony.**

Plaintiff was born in 1962 and was 44 years old on the date
of the Commissioner's final decision. She is married with three
children, ages 14, 19, and 22. The two younger children live at
home. Plaintiff was employed as a fruit box gift packer until
September 2002 when she quit permanently following a panic
attack. She had worked well with fellow employees and
supervisors.

Plaintiff continues to suffer from panic attacks, but they
are now less frequent because she takes medication and seldom
leaves her home. She has frequent periods of depression and
other periods of intense energy when she will go for extended
periods of time without sleeping. She has been counseled to
attend a bipolar group meeting regularly but her attendance has
been sporadic at best because of her panic attacks.

Plaintiff complains of migraine headaches with shooting
pains in her ear that last from three to five days and occur as
often as twenty times a month. She clarified, however, that "a
lot of times . . . they're not so bad. Sometimes they just feel
like a tension headache."

6 - OPINION AND ORDER

Plaintiff cleans her house "all the time" and "spends a lot of time in her yard," but she has lost the desire to do those chores as she did before she allegedly became disabled.  Her husband does all the grocery shopping because of her suscept- ibility to panic attacks.  Plaintiff's friends must come to her home because of her reluctance to leave the home.

**2.    Lay Witness Evidence**.

**Richard Hart**.

Plaintiff's husband testified that plaintiff came home from work one day after having a "break-down" and "things at that point started to implode."  His wife used to be fastidious about housecleaning but that has changed since she quit her job.  Their daughter now helps around the house.  Plaintiff writes notes to remind herself of the tasks she needs to complete.  Her relationship with friends has changed because she no longer visits them.  Her disorders have at times kept him at home when he should be doing his job as a tree surgeon.

Plaintiff quit drinking in about 2000 but drinking has been a problem "about a dozen times since then" but not recently.  She has complained about shooting pains and headaches for quite a long time.

**Brenda Martinez**.

Plaintiff's sister responded to a questionnaire.  She noted, inter alia, plaintiff gets along with family members "as long as

7 - OPINION AND ORDER

she is on her meds," but tends to get off track and repeat
herself.  She goes shopping once a week and sometimes more often.
Her friends seldom visit her.  She cannot hold conversations
because she repeats herself and takes everything personally.  She
has difficulty relating to store clerks, doctors and nurses, and
social workers.  She does not drive because she is drugged most
of the time.  Her medications help her "when taken right."

In summary, Martinez stated her sister "needs stable
counseling for [a] long time.  Then maybe work later."

## 3.   **Medical Records - Treating Physicians**.

Plaintiff was treated for her allegedly disabling
impairments by the following:

### **Rogue Valley Medical Center**.

Plaintiff was admitted to the Medical Center for acute
alcohol intoxication in September 2002 and was discharged three
days later with a diagnosis of alcohol intoxication and Valium
withdrawal.  On October 25, 2002, plaintiff was again treated in
the emergency room for alcohol intoxication.  Charts notes from
this visit reflect she has a long history of alcohol abuse and
had visited the emergency room "three or four times over the last
month requesting medications for anxiety and two days earlier had
showed up intoxicated.  Her blood alcohol level was .301 and a
drug screen was positive for benzodiazepenes."

8 - OPINION AND ORDER

**Providence Medford Medical Center.**

In January 2002, plaintiff was treated in the Emergency Room (ER) for sharp, spasmodic pain behind her right ear.  She was diagnosed as suffering from musculoskeletal right neck pain and spasms.  Drug-seeking behavior was considered at the time but thought "not likely."

On October 1, 2002, plaintiff was again treated at the ER for acute panic disorder, anxiety disorder, obsessive/compulsive disorder, and stimulant drug abuse.  A week later, she returned to the ER complaining of low back pain.  She was diagnosed with acute radicular low back pain with an "ill-defined psychiatric disorder, suspect hypomania."  Plaintiff was adamant that she be prescribed Soma (a muscle relaxant).  The treating physician was more comfortable with prescribing other medications.

On October 17, 2002, plaintiff's sister called paramedics to take plaintiff to the ER because plaintiff had been drinking and the sister was concerned about her mixing alcohol and medications.  On October 24, 2002, plaintiff again was admitted to the ER because of her belligerent behavior following a drinking binge.  She was discharged the next day with a diagnosis of alcohol intoxication, bruises, bronchitis, and depression.  She agree to participate in Alcoholics Anonymous.  There is no record that she ever did so.

On October 27, 2002, plaintiff was again brought to the ER complaining of generalized pain and anxiety.  The differential diagnoses were "anxiety attack, versus bipolar disorder, versus panic attack, versus drug seeking behavior."

On July 16, 2003, plaintiff visited the ER complaining of anxiety and sense of loss of control.  The differential diagnoses on this visit were depression secondary to steroids, chronic depression, and anxiety.

On October 16, 2003, plaintiff was admitted to the Medical Center following an overdose of narcotics and benzodiazepenes. She also complained of buttock pain.  According to treating physician, Phillip J. Billoni, M.D., plaintiff's sister reported plaintiff has had "many admissions for narcotic overdose" and that plaintiff "usually takes five times as many pills as are prescribed and if she runs low, will supplement with alcohol." She "manipulate[s] providers and abuse[s] prescription medications."  Plaintiff signed herself out of the hospital against medical advice.

**Stephen Shekhar, M.D. - General Practitioner.**

In December 2002, Dr. Shekhar signed a preprinted form noting that plaintiff was unable to work "at this time" because of "panic attack" and "she may be off for [a] further 2 weeks."

**Walter Carlini, M.D. - Neurologist.**

On June 14, 2004, plaintiff had an MRI of her brain based on

her complaint of a headache with vertigo.  An "abnormal deep white matter signal [was found] within the left frontoparietal deep white matter" suggestive of "early small vessel ischemic changes, gliosis (scars in the central nervous system) or less likely, a demyelinating process."

On August 26, 2004, neurologist Walter Carlini, M.D., examined plaintiff for complaints of episodic dizziness and headaches over the last 2-3 years, which, by plaintiff's report, "last as long as 3 days and are associated with nausea, blurring of vision, and are also frequently associated with visual aura described as seeing 'sparkly little lights that look like snow coming down from above.'"  Dr. Carlini diagnosed migraine with aura and recommended that plaintiff stop smoking because the habit "is a terrible trigger for migraines."  He also recommended Topomax medication.  Dr. Carlini noted he would be happy to see plaintiff again if his recommendations were followed and proved to be insufficiently helpful.

On May 26, 2005, plaintiff again saw Dr. Carlini and reported that, despite taking Topomax, she experienced migraines eight times a month, lasting two-three days each.  Dr. Carlini noted with emphasis that plaintiff did not follow his recommendation to quit smoking.  Dr. Carlini again "strongly encouraged" her to stop smoking and seek help from nurse practitioner Patti Lane FNP, of the Medford Family Practice

11- OPINION AND ORDER

Clinic, who had participated in plaintiff's health care since 2000. Nurse Lane was associated with Bruce Ames, M.D., who had treated plaintiff for various physical ailments until June 2004, when he transferred her care to others in the clinic because of her ongoing "demanding and rude" behavior.

**Denis Fiallos, M.D. - Psychiatrist.**

On November 5, 2002, plaintiff underwent an evaluation by psychiatrist, Denis Fiallos, M.D. She gave a history of panic attacks which she attributed to severe stress arising from her daughter's addiction to "crank." When they first began, she was prescribed Celexa and Valium, which Dr. Fiallos surmised she took to excess. He noted she was an unreliable historian who gave "very contradicting information" regarding her use of medications. Dr. Fiallos also noted plaintiff had previously visited the clinic and that "she has been quite boisterous, demanding, wanting to be seen immediately, and wanting to obtain prescriptions." She is "difficult to deal with" because of "her general demeanor and presentation."

Plaintiff described herself to Dr. Fiallos as a "functional drinker" without saying how much she drank, although at one point she acknowledged she was an alcoholic who was now sober. Her recitation of her drinking history was contradictory. During the examination, plaintiff was extremely agitated, restless, loud, boisterous, histrionic, and dramatic with exaggerated effectual

responses.  She was, however, "fairly well oriented in all three spheres," with limited insight and somewhat impaired judgment.

Dr. Fiallos diagnosed alcohol dependence, benzodiazepene dependence, possible marijuana abuse, and a substance induced anxiety disorder.  She has a personality disorder, NOS with significant histrionic features, suicidal ideation, and severe psychosocial stressors.  He assigned a current GAF of 50 (serious symptoms or serious impairment in social, occupational, or school functioning).  Dr. Fiallos repeatedly recommended that plaintiff enter a detoxification center.

**Jackson Dempsey, M.D. - Psychiatrist.**

On November 5, 2003, plaintiff was evaluated by psychiatrist Jack Dempsey.  She acknowledged she was alcoholic "until three years ago" and although she quit drinking, she has had many slips.  She has also heavily abused benzodiazepene.  He diagnosed bipolar disorder, panic disorder with agoraphobia, history of alcohol abuse, and history of benzodiazepene abuse.  He also assigned a current GAF score of 50.

On January 2, 2004, plaintiff reported her Trileptal prescription was no longer working as well as before, and she had increasing depression, an increase in racing thoughts, trouble sleeping, feelings of being overwhelmed, and anxiety attacks. She did not have the mood elevations since stopping Trazodone.

13 - OPINION AND ORDER

Dr. Dempsey increased the Trileptal dosage and resumed the trazodone medication.

On February 27, 2003, plaintiff reported some improvement with the change in medication, with less frequent panic attacks, no racing thoughts, and she was able to get out of bed when she was depressed.  She stated, however, that she never has a good day because of anxiety, low energy, and depression.  She requested a change in medication.  Dr. Dempsey increased the dosage of Trileptal and also prescribed Xanax, without refills.

On April 28, 2004, plaintiff reported partial improvement in her level of depression and anxiety, but significant agoraphobia. Dr. Dempsey continued her prescription medications.  He noted plaintiff "is supposed to be seeing her counselor regularly, but continues to miss some appointments."

On June 23, 2004, Dr. Dempsey noted plaintiff "continues to obtain substantial benefit from her medications" with less depression and anxiety.  The medication caused her some dizziness, shaking of her right hand, and difficulty verbalizing her thoughts.  She told Dr. Dempsey she had "a falling out" with her primary care provider because she believed he was not diagnosing her properly.

On September 23, 2004, plaintiff reported that for the most part she is doing better and "has more good days than bad."

On December 17, 2004, plaintiff reported she recently had numerous physical problems.  Dr. Dempsey noted the medications were providing "substantial improvement" in plaintiff's bipolar disorder.

On May 15, 2005, plaintiff reported she was having more bad days than good and was not feeling very good of late. Dr. Dempsey noted she had recently undergone a hysterectomy, which might be a contributing factor.

On July 5, 2005, Dr. Dempsey completed a "Mental Residual Function Capacity Form" in which he opined that plaintiff had marked limitations in understanding and remembering detailed instructions, performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances, working in close proximity with others, accepting instructions and responding appropriately to criticism from supervisors, and traveling in familiar places or using public transportation.  He noted her prognosis was fair to poor and that she was partially compliant with treatment.  He noted she had moderate limitations remembering locations and work-like procedures, carrying out detailed instructions, maintaining attention and concentration for extended periods, sustaining an ordinary work routine without special supervision, interacting appropriately with the general public, getting along

with co-workers, maintaining appropriate social behaviors, and responding appropriately to changes in the workplace.

Chart notes during this period reflect plaintiff cancelled appointments on short notice, was reluctant to take certain medications such as Depakote (for treatment of bipolar disorder), and was an infrequent participant in the group therapy sessions offered by Jackson County Mental Health.

**4.   Medical Records - DDS Consulting Physicians**.

The following DDS practitioners reviewed plaintiff's medical records:

**Paul Rethinger, Ph.D. - Psychologist**.

In April 2003, Dr. Rethinger concluded from his records review that plaintiff had medically determinable non-severe impairments based on a history of depression, history of substance abuse, and anxiety, which produced mild difficulties in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace.

Dr. Rethinger noted that, as of January 2003, plaintiff was doing much better, and he concluded she was ready to return to work following her 2002 hospitalization for intoxication, drug abuse, anxiety, and panic attack.  He understood the medical records as of that date to reflect plaintiff was well-groomed, compliant in attending counseling sessions, friendly, with no history of emotional or psychiatric hospitalizations.

**Bill Hennings, Ph.D. - Psychologist**.

In June 2003, Dr. Hennings made the same observations and found the same limitations as Dr. Rethinger.  He opined plaintiff's panic attacks and memory problems were undermined by her drug-seeking behavior.

<u>**ANALYSIS**</u>

1.   <u>**Rejection of Plaintiff's Testimony**</u>.

The ALJ based his nondisability determination in part on his finding that plaintiff's testimony regarding the extent of her limitations was "not totally credible."

**Standards**.

A claimant who alleges disability based on subjective symptoms "must produce objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged. . . .'" (the <u>Cotton</u> test).  <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 344 (9th Cir. 1991) (quoting 42 U.S.C. § 423(d)(5)(A) (1988)).  <u>See also</u> <u>Cotton v. Bowen</u>, 799 F.2d 1403, 1407-08 (9th Cir. 1986).  A claimant need not produce objective medical evidence of the symptoms or their severity.  <u>Smolen v. Chater</u>, 80 F.3d 1276, 1281-82 (9th Cir. 1996).

If a claimant produces objective evidence that underlying impairments could cause the pain she complains of and there

is no affirmative evidence to suggest the claimant is
malingering, the ALJ must provide clear and convincing reasons
for rejecting plaintiff's testimony regarding the severity of
her symptoms.  Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir.
1993).  See also Smolen, 80 F.3d at 1283.  To determine whether
plaintiff's subjective testimony is credible, the ALJ may rely
on (1) ordinary techniques of credibility evaluation such as the
claimant's reputation for lying, prior inconsistent statements
concerning the symptoms, and other testimony by the claimant that
appears less than candid; (2) an unexplained or inadequately
explained failure to seek treatment or to follow a prescribed
course of treatment; and (3) the claimant's daily activities.
Id. at 1284 (citations omitted).

**Analysis.**

There has not been a specific diagnosis by any treating or
examining physician that plaintiff is a malingerer.  In addition,
there is objective medical evidence to support the existence, if
not the severity, of plaintiff's psychological impairments
relating to bipolar disorder, anxiety, panic attacks, and
depression, and her physical impairment relating to migraine
headaches.

The Commissioner, however, contends the ALJ gave clear and
convincing reasons for finding plaintiff not entirely credible in

describing the existence and severity of her psychological and
physical limitations.  I agree.

The ALJ noted the repeated references by treating physicians
and their assistants to plaintiff's actual or perceived drug-
seeking behavior as well as plaintiff's abusive behavior towards
practitioners who did not satisfy her demand for medications.
The ALJ also noted Plaintiff gave inconsistent statements
regarding the extent of her alcohol use when she was plainly
intoxicated and inaccurately recited her prior medical history to
new health care providers, including omitting the fact that other
doctors had "fired" her.  In addition, the ALJ noted plaintiff
frequently did not comply with treatment recommendations and
engaged in doctor-shopping.

I find the record amply supports the ALJ's credibility
finding.  The ALJ stated clear and convincing reasons for
questioning plaintiff's credibility as to the limiting effects of
her impairments and did not err in basing his nondisability
finding, in part, on plaintiff's lack of credibility.

**2.    Rejection of Lay Witness Evidence**.

The ALJ may reject the testimony of a lay witness only if he
gives germane reasons for doing so.  *Smolen v. Chater*, 80 F.3d
1273, 1288 (9th Cir. 1996).  Plaintiff contends the ALJ failed to
give such reasons when he rejected the evidence presented by

plaintiff's husband and sister regarding her limitations, her mental state, and her ability to work.  I disagree.

The ALJ did not reject the lay witness evidence outright but, instead, gave it some weight.  The ALJ noted, however, plaintiff's "multiple visits to doctors and providers [] belie her supposed social anxiety" that is mentioned by her husband and sister.

For all the reasons set forth above regarding plaintiff's credibility, I conclude the ALJ appropriately evaluated the lay witness testimony and gave it the appropriate weight.

**2.    Rejection of Opinions of Treating Physicians.**

Plaintiff contends the ALJ improperly rejected medical opinion evidence from Dr. Dempsey, Dr. Fiallos, and Dr. Carlini, and argues that if their opinions are credited, plaintiff should be found disabled.

**Standards.**

The opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant:

> Where the treating doctor's opinion is not
> contradicted by another doctor, it may be
> rejected only for clear and convincing
> reasons supported by substantial evidence in
> the record.  Even if the treating doctor's
> opinion is contradicted by another doctor,
> the ALJ may not reject this opinion without
> providing specific and legitimate reasons
> supported by substantial evidence in the
> record.  This can be done by setting out a

> detailed and thorough summary of the facts
> and conflicting clinical evidence, stating
> his interpretation thereof, and making
> findings.  The ALJ must do more than offer
> his conclusions.  He must set forth his own
> interpretations and explain why they, rather
> than the doctors', are correct.

Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998)(internal citations omitted).  In turn, "the opinions of examining physicians are afforded more weight than those of non-examining physicians." Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007).  The opinions of treating physicians should be credited as true if the ALJ fails to provide clear and convincing reasons for rejecting them.  See Smolen v. Chater, 80 F.3d 1273, 1992 (9th Cir. 1996).

Here, the ALJ rejected aspects of the opinions of three of plaintiff's treating physicians regarding her ability to sustain full-time employment.

**Dr. Dempsey**.

As noted above, Dr. Dempsey opined plaintiff had marked limitations in a number of areas of occupational functioning as a result of her panic attacks, anxiety, and depression and that her prognosis was "fair to poor."  Plaintiff contends the ALJ erred in rejecting Dr. Dempsey's opinion.  I disagree.

The ALJ stated "Dr. Dempsey's chart notes contain scant reference to reasons why claimant should be rated with marked limits."  The ALJ also took into account Dr. Dempsey's earlier

observation that plaintiff was only "partially compliant with treatment," and that, when she took her medications as prescribed, she had significant improvement in her bipolar condition.

On this record as a whole, I conclude the ALJ gave clear and convincing reasons for not fully crediting Dr. Dempsey's opinion regarding plaintiff's functional limitations.

**Dr. Fiallos**.

Plaintiff contends the ALJ improperly rejected Dr. Fiallos' opinion that plaintiff had a current GAF score of 50, indicating severe functional impairments, based on "alcohol dependence, benzodiazepine dependence, possible marijuana abuse, substance-induced anxiety disorder, and personality disorder not otherwise specified with severe histrionic features." I disagree. The ALJ specifically gave great weight to Dr. Fiallos's overarching emphasis on plaintiff's alcohol and drug problems, and his strong advice that plaintiff enter a detoxification center.

Based on the record as a whole, I conclude the ALJ evaluated Dr. Fiallos's medical evidence and gave clear and convincing reasons as to the weight he assigned to Dr. Fiallos's opinions.

**Dr. Carlini**.

Plaintiff contends the ALJ failed to credit Dr. Carlini's opinion that plaintiff suffered from migraine headaches that constituted a severe impairment. The ALJ specifically noted

22- OPINION AND ORDER

plaintiff failed to comply with Dr. Carlini's advice that she stop smoking.  Plaintiff concedes only that Dr. Carlini told her "to stop smoking because it was possible smoking triggered her migraines."  In fact, Dr. Carlini implored plaintiff to stop smoking because "the habit is a terrible trigger for migraines" and that he would see her again only if she followed his recommendations.  She did not do so.  The record fully supports the ALJ's finding of plaintiff's noncompliance with recommended treatment, which, standing alone, is sufficient to justify the Commissioner's denial of benefits based on functional limitations caused by plaintiff's migraine headaches.

**4.    <u>Adequacy of Vocational Expert (VE) Testimony</u>.**

The ALJ asked the VE to consider whether a person of plaintiff's age and education, who is able to perform simple, routine tasks, and follow simple, routine instructions, with only occasional public contact, could perform her past relevant work as a packer and product assembler.  The VE answered in the affirmative.  Plaintiff contends the ALJ's hypothetical to the VE was inadequate because it failed to include plaintiff's credible allegations, limitations corroborated by lay witness testimony, and limitations assessed by Drs. Carlini, Fiallos, and Dempsey.

I disagree.  For all the reasons stated above, I conclude the ALJ gave an appropriate hypothetical to the VE based on the

credible evidence in the record as a whole.  Accordingly, I conclude the VE did not err in finding plaintiff could perform her past relevant work.

### CONCLUSION

For these reasons, the Commissioner's final decision denying benefits to plaintiff is **AFFIRMED** and this matter is **DISMISSED** with prejudice.

IT IS SO ORDERED.

DATED this 9  day of July, 2008.


         /s/  Malcolm F. Marsh
MALCOLM F. MARSH
United States District Judge

24 - OPINION AND ORDER